**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0086n.06
Filed: January 30, 2008

**No. 06-6514**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| RONALD N. SIMON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | **On Appeal from the United** |
| | ) | **States District Court for the** |
| JOHN COOK, IN HIS OFFICIAL AND | ) | **Eastern District of Kentucky** |
| INDIVIDUAL CAPACITIES, AND THE | ) | |
| LEXINGTON-FAYETTE URBAN COUNTY | ) | |
| GOVERNMENT, | ) | |
| | ) | |
| Defendants-Appellees. | | |

**Before:** **BOGGS, Chief Judge; GIBBONS, Circuit Judge; and BELL, District Judge.[1]**

**BOGGS, Chief Judge.** On October 31, 2003, Ronald Simon telephoned the Lexington

Police Department to report that government officials had been harassing him. After two officers

arrived at his house, Simon allegedly stated that the police and county coroner had been harassing

him and that many agencies and government officials were implicated in the alleged harassment.

Officer John Cook handcuffed Simon after Simon pointed his finger in Cook's face. Pursuant to

Kentucky law, Officer Cook detained Simon and transported him to Eastern State Hospital (ESH)

for a mental evaluation. A clinician diagnosed Simon with "psychotic disorder – not otherwise

---

[1]The Honorable Robert Bell, Chief United States District Judge for the Western District of
Michigan, sitting by designation.

specified" and ordered him medicated and held for 72 hours. Simon brought a § 1983 suit against Officer Cook, individually and in his capacity as a police officer, and the Lexington-Fayette Urban County Government (LFUCG). Simon also challenged the constitutionality of the Kentucky statute and raised numerous state law claims. The district court held that Simon's constitutional rights had not been violated and granted summary judgment for Cook and the LFUCG. The court also rejected Simon's challenges to the statute itself. Simon appeals those holdings and appeals the district court's holding allowing discovery of his psychotherapist-patient communications. We affirm.

**I**

On October 31, 2003, around 4:30 p.m., Simon telephoned the Lexington Police Department to report "an incident of harassment." Specifically, Simon reported seeing a coroner's van behind him in traffic for the second time in a week and stated that he felt that the coroner's van had been following him and that he "felt harassed by the coroner's van." Simon also told the dispatcher that he "had received ambiguous warnings over the previous two or three years from various anonymous people that may or may not have been threats against [his] life." Simone emphasized that he "did not know who was responsible for harassing [him] and that [he] had only vague and very reluctant suspicions that police officers might be involved."

Officer Gene Haynes was dispatched to Simon's home to take Simon's statement and arrived approximately ten minutes after Simon's call to the police. En route, Haynes remembered that Simon's address had been mentioned during a briefing sometime prior to October 31, checked his police computer, and saw that Simon's address was flagged as a "signal 10," meaning that officers

were advised of a potential risk in their contact with citizens at that address.[2] Haynes did not know the basis for the "signal 10" alert but requested dispatch of a second unit to Simon's address. When Haynes arrived, he and Simon began to converse on Simon's porch. According to Haynes's deposition, Simon stated that he felt he had been harassed, that the coroner had been following him, that such harassment may have been politically motivated, that the state police were involved, and that then-congressman Ernie Fletcher was also involved. Haynes described Simon's appearance as "neatly dressed and well-groomed" and admitted that Simon displayed a "calm demeanor" and spoke rationally and coherently. Haynes also admitted that Simon was not violent or threatening at that time.

When Officer Cook arrived, he determined that the situation was non-violent and that Officer Haynes had the situation under control. Officer Cook stood at the foot of Simon's porch, approximately four or five feet from Simon. Officer Haynes asked Simon to repeat his story. Simon again repeated that he felt that he was being watched, that it was politically motivated, that the state police were involved, and that the Kentucky Attorney General's office was involved. Haynes recalled that Simon had mentioned being attacked while using a phone and while in his own house. Haynes later testified that such comments "did not seem like comments of a rational person at the time." According to Officer Cook, Simon said that the coroner's van was sending him the message that the police would put Simon in a "body bag." Officer Cook asked Simon if he had ever been diagnosed with a mental illness, if he was under the care of a physician, or if he had been prescribed

---

[2]Later testimony indicated that an officer safety alert does not necessarily indicate that a person is mentally ill.

any medication. Simon replied negatively.

Officer Cook told Simon that his allegations "sounded outlandish" and told Simon that if he felt there was a conspiracy against him, he should contact the FBI or the Attorney General's office. Simon stated that he had tried to call those authorities from a phone booth, but that three men in black had attacked him. Simon thought those men were LFUCG police officers. According to Officer Cook, Simon said that he was going to begin following police officers himself to find out why they were harassing him. Simon later denied making such a statement and insisted that he only said "how would you like it if I followed you around." According to Haynes and Cook, Simon then began screaming and yelling and "stuck his finger in the close proximity of Officer Cook's face." Haynes felt that Simon's actions "could have been a threat." Simon disputes that he raised his voice or jabbed his finger at Cook, although he admits pointing his finger within approximately a foot of Cook's face. Officer Cook told Simon not to point at him, but, according to Cook, Simon continued to approach and jabbed his finger in Cook's face. Officer Cook stated that if he had not flinched away from Simon, Simon's finger would have struck his face. Simon maintains that he merely continued pointing his finger at Cook. Officer Cook handcuffed Simon's arms behind his back, emptied his pockets, and confined Simon in the back seat of his police cruiser.

Kentucky Revised Statutes § 202A.041 authorizes the warrantless arrest of an individual who appears to be mentally ill, under certain circumstances:

> Any peace officer who has reasonable grounds to believe that an individual is mentally ill and presents a danger or threat of danger to self, family, or others if not restrained shall take the individual into custody and transport the individual without unnecessary delay to a hospital or psychiatric facility . . . .

KY. REV. STAT. ANN. § 202A.041(1). The statute further states that "the peace officer shall provide written documentation which describes the behavior of the person which caused the peace officer to take the person into custody." *Ibid.* Within 18 hours, a qualified mental-health professional must determine whether the person meets the criteria for involuntary hospitalization as provided in Kentucky Revised Statutes §§ 202A.026, 202A.031, and other sections. *Ibid.* Elsewhere in chapter 202A, "danger" or "threat of danger" is defined as "substantial physical harm or threat of substantial physical harm upon self, family, or others . . . ." *Id.* § 202A.011(2). "Mentally ill person" is defined as "a person with substantially impaired capacity to use self-control, judgment, or discretion in the conduct of the person's affairs and social relations, associated with maladaptive behavior or recognized emotional symptoms where impaired capacity, maladaptive behavior, or emotional symptoms can be related to physiological, psychological, or social factors." *Id*. § 202A.011(9).

LFUCG Division of Police General Order 88-3/D addresses "Arrest and Transportation of Hospitalized or Mentally Ill Persons" and reproduces the language and requirements of Section 202A.041. The regulations also incorporate the statutory definition of "mentally ill person." The fact that Officer Cook followed those regulations is not disputed.

Acting pursuant to Section 202A.041 and departmental regulations, Officer Cook documented the incident in a post-arrest complaint and transported Simon to ESH. The complaint stated that Simon was placed under "emergency detention" and was a "danger to himself and others." Officer Cook brought Simon into the hospital, gave the hospital a copy of the Uniform Citation, and left.

ESH records show that Simon was admitted at 7:30 p.m. on October 31. A Dr. Goldstein

examined Simon that evening. According to Goldstein's summary of her interview with Simon,

Simon reported that while he was in a phone booth attempting to make a complaint about alleged

police harassment, a car backed its exhaust pipe to the phone booth and tried to poison him with

carbon monoxide. Simon also said that when he went to the emergency room for treatment for that

poisoning, a police officer assaulted him. According to Dr. Goldstein, although Simon denied any

past psychiatric hospitalizations, he had told other staff members at ESH that he had been to ESH

one time before. Simon denied the facts reported in the Uniform Citation, but Goldstein concluded

that Simon "does continue to have a fixed delusion about the police being out to get him and out to

harass him." Goldstein was unable to reach either of the neighbors whose phone numbers Simon

had provided.

Dr. Goldstein concluded that Simon "appears to be extremely paranoid but logical at times,

although he does appear to be delusional of the police. He denies any suicidal or homicidal ideation,

or auditory or visual hallucinations. His insight and judgment appears [sic] to be *severely impaired*."

(emphasis added). Goldstein diagnosed Simon with "psychotic disorder, not otherwise specified"

and placed him on a 72-hour hold "due to patient threats and harassment towards police and feeling

extreme paranoia." Goldstein also concluded that "the patient is felt to be extremely dangerous to

himself as well as being dangerous to other people." A Dr. Patel concurred in placing Simon on 72-

hour hold. Goldstein also ordered that Simon be medicated with Risperdal. A 72-hour emergency

admission is authorized under Kentucky Revised Statutes § 202A.031. After 72 hours, other

procedures for extending involuntary hospitalization must be followed. *See* KY. REV. STAT. ANN.

§ 202A.031(2). Although the record is ambiguous on this point, it appears that Simon was released

after 72 hours.[3]

Simon filed his complaint on October 29, 2004. In his complaint, Simon alleged that Officer Cook's conduct had violated his due process rights and his constitutional right to be free from unlawful searches and seizures and that chapter 202A of the Kentucky Revised Statutes was unconstitutional. Depositions, interrogatories, affidavits, and admissions were sought and included in the record. The district court adopted the magistrate judge's order allowing discovery of Simon's medical records from ESH. On motions for summary judgment, the district court held that no violation of Simon's constitutional rights had occurred; therefore, Cook enjoyed qualified immunity from suit, and there was no basis for relief against the LFUCG. The court further held that Simon's constitutional challenges to the Kentucky statute failed. The district court declined to exercise supplemental jurisdiction over Simon's state law claims and dismissed them without prejudice.

## II

We "review[] de novo a district court's grant of summary judgment on qualified immunity grounds, 'because the determination of whether qualified immunity is applicable to an official's actions is a question of law.'" *See v. City of Elyria*, 502 F.3d 484, 490 (6th Cir. 2007) (quoting *Farm*

---

[3] The hospital admission history states that Simon was placed on a 72-hour hold. However, Simon states in his brief to this court that he was held for five days. The magistrate judge, in a ruling, also stated that Simon was held for five days. Finally, the district court stated that Simon was not discharged until November 5, 2003, approximately five days after his admission. However, the district court stated in another ruling that Simon was held for 72 hours, and Simon himself wrote in a letter attached to an affidavit he submitted below that he was released from ESH after 72 hours. The Kentucky statutes authorize a 72-hour confinement, and Simon does not raise any claims or arguments that he was held beyond the authorized time. We therefore assume that Simon was held for 72 hours.

*Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 532 (6th Cir. 2002)). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment has the burden of proof and must demonstrate that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In reviewing a decision on a motion for summary judgment, we view the factual evidence and draws all reasonable inferences in favor of the non-moving party. *City of Elyria*, 502 F.3d at 491.

A district court's ruling on a constitutional challenge to a statute is reviewed de novo. *United States v. Sawyers*, 409 F.3d 732, 735 (6th Cir. 2005).

We review de novo the district court's analysis of the contours of the psychotherapist-patient privilege. *United States v. Hayes*, 227 F.3d 578, 581 (6th Cir. 2000). However, we have also held that where privilege issues are discovery-related, we review for abuse of discretion. *See Toledo Edison Co. v. G A Techs., Inc.*, 847 F.2d 335, 341 (6th Cir.1988); *see also Schoffstall v. Henderson*, 223 F.3d 818, 822-23 (8th Cir. 2000) (reviewing for abuse of discretion a district court's discovery order regarding the plaintiff's mental evaluations); *but see Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 712 n.10 (6th Cir. 2006) (applying de novo review when "the particular discovery issue goes to the application of the . . . privilege"). Additional confusion stems from the fact that, becuase the issue of waiver of the psychotherapist-patient privilege has rarely been litigated

in this circuit, the precise standard of review for that issue is unclear. *See Maday v. Public Libraries of Saginaw*, 480 F.3d 815, 821 (6th Cir. 2007) (holding that placing emotional state in issue waived the privilege, but not stating the standard of review being employed). In this case, Simon appeals the district court's decision allowing discovery of his allegedly privileged communications; therefore, we review for abuse of discretion. We note that little hinges on the standard employed since a lower court abuses its discretion when it commits an error of law. *United States v. Ganier*, 468 F.3d 920, 925 (6th Cir. 2006); *see Koch v. Cox*, 489 F.3d 384, 388 (D.C. Cir. 2007) (noting that abuse-of-discretion review of discovery order regarding plaintiff's mental evaluations included review for errors of law).

## III

### A. Claims Against Officer Cook

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether qualified immunity is warranted, we employ a three-part test:

> The first inquiry is whether the Plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.

*Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004) (quotation marks omitted); *see*

*Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The existence of qualified immunity is a legal question for the court unless there is a genuine issue of material fact regarding whether the defendant actually committed acts that would violate a clearly established right. *Black v. Parke*, 4 F.3d 442, 446-49 (6th Cir. 1993). In this case, we hold that Officer Cook did not violate Simon's constitutional rights. Accordingly, Cook is immune from suit.

**1. Alleged Fourth Amendment Violation**

The Fourth Amendment grants citizens the right to be free from unreasonable searches and seizures by government officials. U.S. CONST. amend. IV; *Gardenhire v. Schubert*, 205 F.3d 303, 312-13 (6th Cir. 2000). There is no question that Officer Cook "seized" Simon within the meaning of the Fourth Amendment when he handcuffed Simon and took him to ESH. In *Monday v. Oullette*, we joined several other circuits in holding that the "Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997); *accord Ahern v. O'Donnell*, 109 F.3d 809, 817 (1st Cir. 1997) (per curiam); *Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 401 (7th Cir. 1993); *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993); *Gooden v. Howard County, Md.*, 954 F.2d 960, 967-68 (4th Cir. 1992) (en banc); *Maag v. Wessler*, 960 F.2d 773, 776 (9th Cir. 1991). We have reiterated the probable cause standard each time the question has been presented to this court. *See Ziegler v. Aukerman*, ___ F.3d ___, No. 06-2618, 2008 WL 114855, at *4-*6 (6th Cir. Jan. 14, 2008); *Fisher v. Harden*, 398 F.3d 837, 842-43 (6th Cir. 2005); *Roberts v. Anderson*, 213 F. App'x 420, 427 (6th Cir. 2007)

In the *Monday* case, we analogized a dangerous mental condition to the role of criminal activity in traditional Fourth Amendment analysis and concluded that "a showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." 118 F.3d at 1102 (quoting *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983)). Moreover, we stated that "because 'probable cause is a fluid concept[,] turning on the assessment of probabilities in particular factual contexts,' courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official." *Ibid*. (internal citation omitted). In *Monday*, officers responded to a call of a potential suicide after the plaintiff had called a psychological counseling hotline and stated that he was mixing alcohol with his prescription medication. 118 F.3d at 1101. After being admitted to plaintiff's living room, Officer Oullette observed that plaintiff was intoxicated and depressed. *Ibid*. Oullette asked the plaintiff if he had any pills, and the plaintiff produced a vial of Xanax pills from his shirt pocket. *Ibid*. Officer Oullette determined that at least twenty pills were missing, even though the prescription had been renewed just the day before. *Ibid*. Plaintiff refused to go to the hospital, told Oullette his ex-wife had the missing pills, and continued drinking his beer. *Ibid*. Reviewing those facts, we held that officers had probable cause to believe that the plaintiff was suicidal and might hurt himself if not taken to a hospital.

By contrast, in *Fisher*, we held that officers lacked probable cause to believe that an elderly man, who had been hunting while sitting on railroad tracks, was suicidal or a danger when he had obeyed their commands to drop his rifle and had approached them in a normal manner. 398 F.3d at 843. The *Fisher* court emphasized that the officers had "never questioned Fisher to determine if

he might be depressed and attempting to commit suicide" before placing him face down and handcuffing him. *Ibid*. Fisher had not done anything "that the officers considered to be suspicious or threatening," "he was never verbally threatening, abusive, or irrational," and "he did not make any statements about hurting himself or anyone else." *Ibid*.

Although the instant case presents a closer question than either *Fisher* or *Monday*, we hold that the undisputed facts indicate that Cook had probable cause to believe that Simon was a danger to himself or others. Officer Cook was aware of the "signal 10" officer safety alert. Unlike the officers in *Fisher*, Officer Cook questioned and observed Simon at length. Simon's allegations that the coroner was following him; that men in black, whom he speculated may have been police, had attacked him; that unknown persons had backed a car's tailpipe up to a phone booth Simon had been using in an effort to poison him with carbon monoxide; and that multiple government agencies were complicit in these actions were bizarre and improbable. Although we credit Simon, and Haynes's favorable statements, that Simon did not initially seem dangerous, even Simon admits that the situation escalated during his conversation with Cook. Crediting Simon's version of events, he pointed a finger within a foot of Officer Cook's face and asked rhetorically, "how would you like it if I followed you around?" Thus, Simon intimated that he intended to follow police officers to see why they were allegedly following him. Officer Haynes testified that Simon's finger-pointing was threatening. Officer Cook flinched to avoid Simon's finger, grabbed Simon's wrist, and handcuffed him.

Taken together, the undisputed facts indicate that Simon demonstrated a high level of irrationality and a relatively low level of dangerousness. That is, his undisputed statements indicated

that he believed that various government officials were harassing him and that the police had attacked him in the past. At the same time, mere finger-pointing presents a very low level of dangerousness. We understand that there is a difference between facts indicating mental illness and merely obstreperous behavior, and we are reluctant to set the bar for probable cause so low that the merely obnoxious are detained for mental evaluation. *Cf. Kerman v. City of New York*, 261 F.3d 229, 240-41 (2d Cir. 2001) (reversing grant of summary judgment for police officers where police stated that the plaintiff had been ranting and acting unstable, but where police had deliberately ignored an opportunity to consult the plaintiff's own doctor before detaining him for mental evaluation). However, that said, probable cause requires only a "probability or substantial chance" of dangerous behavior based on the circumstances of each case. Even if Simon did not present a substantial chance of immediate danger to Cook, his stated intent to follow the police and get to the bottom of the alleged attacks against him indicated a substantial chance of irrational and dangerous behavior in the near future. While such a statement might not suffice on its own, we must view the statement in the context of Simon's apparently paranoid statements about the police. Thus, taken together, Simon's words and actions created probable cause to believe that Simon was mentally ill and dangerous. Moreover, the fact that Dr. Goldstein's conclusions dovetail with Officer Cook's conclusions is further evidence that Cook's judgment was objectively reasonable.[4] Given the

---

[4] Of course, *Monday* admonishes that "courts evaluate the existence of probable cause from the perspective of a reasonable and objective person *in the position of the seizing official*." 118 F.3d at 1102 (internal citation omitted) (emphasis added). Accordingly, it is important to note that even if Goldstein had concluded that Simon was mentally healthy, that would not necessarily show a lack of probable cause. *See ibid.* ("a mental health seizure can rest upon probable cause even when the person seized *does not actually suffer from a dangerous mental condition*" (emphasis added)).

- 13 -

existence of probable cause, Officer Cook's decision to detain Simon for a mental evaluation was not a constitutional violation.

## 2. Alleged Substantive Due Process Violation

Simon also claims that Officer Cook made false statements to the staff at ESH and that such conduct violated Simon's right to substantive due process. According to Simon, Dr. Goldstein showed Cook's handwritten statement to Simon, and the "statement falsely asserted that Simon had been a patient at ESH, had been diagnosed as mentally ill[,] and was not taking his prescribed medication." Simon acknowledges in his brief that he must show conduct that "shocks the conscience" in order to prevail on his substantive due process claim. *See United States v. Budd*, 496 F.3d 517, 529 (6th Cir. 2007). To shock the conscience, conduct must have been "so brutal and offensive that it did not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957) (quoted in *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)).

In this case, Simon cannot demonstrate any "conscience-shocking" conduct. Dr. Goldstein noted in Simon's admission history that the written citation indicated that Simon had stated that he had been to ESH once before but that he didn't have mental problems. Goldstein also noted that Simon had told ESH staff that he had been to ESH one time before. Simon offered no evidence that Officer Cook made false statements regarding his mental illness or failure to take medications. Goldstein's report indicates that Simon himself may have said he previously had been treated at ESH. Even if Officer Cook had made false statements as Simon alleges, Dr. Goldstein made her

- 14 -

own independent evaluation of Simon. Morever, the alleged false statements in this case are not so egregious as to "shock the conscience."

Since Officer Cook did not violate Simon's constitutional rights, our inquiry is at an end. We hold that Cook is entitled to qualified immunity.

## B. Claims Against the LFUCG

Because no constitutional violations occurred in this case, the LFUCG necessarily is not liable to Simon. *See, e.g.*, *Monday*, 118 F.3d at 1105; *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993). "If no constitutional violation by the individual defendant is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that a municipality can be liable under § 1983 only for an actual constitutional violation committed by individual official).

## C. Constitutionality of Kentucky Revised Statutes Section 202A.041

### 1. Fourth Amendment

In addition to suing based on Officer Cook's conduct, Simon also challenges the constitutionally of warrantless mental evaluations. Simon requests that we "declare that the Fourth Amendment requires two separate and discrete determinations of probable cause," the first regarding detention and the second regarding mental evaluation. Simon also argues that the Kentucky statute

is unconstitutional because it authorizes unreasonable searches.  Both arguments fail.

As noted above, we have held that the Fourth Amendment requires a showing of probable cause before a person may be seized for mental evaluation.  *Monday*, 118 F.3d at 1102.  The *Monday* court held that no right was violated when an officer had probable cause, and it certainly did not require a warrant.  *See ibid*.  Thus, so long as an officer has probable cause to believe that an individual is dangerous, a warrant is not required in this circuit for a mental-health seizure.  Neither does any precedent suggest that a separate inquiry is required before a mental evaluation may begin.  Indeed, we note that requiring a separate warrant for mental evaluation could introduce significant delay beyond what the statute presently requires.  *See* KY. REV. STAT. ANN. § 202A.041(1) (requiring evaluation within eighteen hours of transport to a hospital or mental facility).  Instead, logically, the probable cause to detain suffices to authorize a mental evaluation.  Regarding Simon's challenge to the Kentucky statute, the *Monday* court's establishment of the probable cause standard itself is meant to ensure the reasonableness of any searches.  Thus, Simon's arguments fail.

## 2. Void for Vagueness

Simon argues that the Kentucky statute authorizing mental-health evaluations is void for vagueness because it fails to provide a police officer "with precise standards to follow in determining whether an individual is dangerous as a result of mental illness."  Appellant's Br. 16.

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits . . . ."  *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966); *see United States v. Haun*, 90 F.3d 1096,

1101 (6th Cir. 1996). An enactment is "void for vagueness" if it fails to establish standards for police that are sufficient to guard against arbitrary deprivations of liberty. *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). An ordinance may also be unconstitutionally vague if it fails "to define the offense with sufficient definiteness that ordinary people can understand prohibited conduct." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999). "An enactment imposing criminal sanctions or reaching a substantial amount of constitutionally protected conduct may withstand facial constitutional scrutiny only if it incorporates a high level of definiteness." *Id.* at 557; *see Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). Where a statute does not reach a substantial amount of constitutionally protected conduct, the statute is void "only if [it] is impermissibly vague in all its applications." *Belle Maer Harbor*, 170 F.3d at 557.

Unfortunately for Simon, Section 202A.041 seems particularly unsuited to a facial challenge to its alleged vagueness. First, although our precedents regarding facial challenges outside the First Amendment have been described as "inconsistent," *see Staley v. Jones*, 239 F.3d 769, 790 n.26 (6th Cir. 2001), it is clear that outside of certain contexts (including the First Amendment and abortion) facial challenges are normally rejected because a person to whom the statute may be constitutionally applied may not challenge the statute on behalf of third parties. *See Amelkin v. McClure*, 205 F.3d 293, 296 (6th Cir. 2000); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (stating that to mount a successful facial challenge outside of the First Amendment, a party must "establish that no set of circumstances exists under which the [statute] could be valid"); *but see Warshak v. United States*, 490 F.3d 455, 477 (6th Cir. 2007) (rejecting application of *Salerno* and holding that "facial

- 17 -

invalidation is justified where the statute, on its face, endorses procedures to authorize a search that clearly do not comport with the Fourth Amendment"), *reh'g en banc granted and opinion vacated Warshak v. United States*, No. 06-4092 (6th Cir. Oct. 9, 2007) (order). Second, and more particular to this case, numerous court decisions have upheld the constitutionality of other statutes that are similar to the Kentucky statute. The fact that similarly phrased statutes allow police officers to detain an individual involuntarily if they have "reason to believe" or a "reasonable belief" that the individual is mentally ill and poses a danger to himself or others weighs heavily against Simon's facial challenge. *See S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 271 (4th Cir. 1998) (citing *Ahern*, 109 F.3d at 817; *Pino v. Higgs*, 75 F.3d 1461, 1468-69 (10th Cir. 1996); *Gooden*, 954 F.2d at 960).

Simon's attempts to bolster his facial challenge are unpersuasive. First, Simon characterizes Section 202A.041 as a criminal sanction. It may be true that criminal sanctions are more susceptible to facial challenges for vagueness. *See Morales*, 527 U.S. at 55 n.22 (declining to apply *Salerno* and stating that even if the First Amendment is not implicated, where "vagueness permeates the ordinance, a facial challenge is appropriate"). Even so, Section 202A.041 clearly does not impose criminal sanctions. Second, although Simon argues separately that the statute violates First Amendment overbreadth doctrine, his vagueness argument does not implicate the First Amendment. Third, Simon argues that a facial challenge is appropriate because Section 202A.041 reaches substantial constitutionally protected conduct. *See Belle Maer Harbor*, 170 F.3d at 557 . However, *Belle Maer* reiterated that "vagueness claims not involving First Amendment freedoms must be examined in light of the facts of the particular case at hand and not as to the statute's facial validity."

- 18 -

*Ibid*. Therefore, since the statute does not impose criminal penalties and Simon's vagueness challenge does not arise from the First Amendment, a facial challenge is inappropriate, and Simon may only challenge the statute as it was applied to him.

As applied to Simon, the definitions of dangerousness and mentally ill person included in chapter 202A are not sufficiently vague as to raise concerns about arbitrary enforcement. "Danger" means "substantial physical harm or threat of substantial physical harm upon self, family, or others . . . ." KY. REV. STAT. ANN. § 202.011(2). "Mentally ill person" means a person with "substantially impaired capacity to use self-control, judgment, or discretion . . . ." KY. REV. STAT. ANN. § 202.011(9). These definitions suffice to prevent arbitrary enforcement and did not give unlimited discretion to Officer Cook. Simon argues the statute is too vague because it does not require an explicit connection between the individual's mental illness and the individual's dangerousness. This argument is meritless, as the statute does require that Cook reasonably believed that Simon was both dangerous and mentally ill. We hold that Cook's belief was reasonable; therefore, as applied to Simon, the statute's conjunction of danger and mental illness is sufficiently definite.

### 3. Overbreadth

On appeal, Simon argues for the first time that Section 202A.041 is unconstitutionally overbroad, in violation of the First Amendment. Because this claim was not raised below, this court is not required to consider it. "Generally, an appellant cannot raise a claim before the appellate court that was not raised below." *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004). As the *Monday* court itself stated, when a claim was not raised before the district court, and the district court

never addressed it, plaintiff "has waived this argument and we will not review it." 118 F.3d at 1105.

### 4. Procedural Due Process

Simon next argues that Section 202A.041 is unconstitutional because it does not require the hospital to retain the officer's written documentation of the reasons why the individual is being detained for a mental evaluation. The statute merely requires that the "peace officer shall provide written documentation which describes the behavior of the person which caused the peace officer to take the person into custody." KY. REV. STAT. ANN. § 202A.041(1). Simon argues that this enables officers to evade allegations that they have submitted false statements, as Simon alleges Officer Cook did in this case. We disagree that due process requires retention of officers' citations.

In the context of involuntary commitment, the Supreme Court has "recognized that for the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty, and in consequence requires due process protection." *Vitek*, 445 U.S. at 491-92 (internal quotation marks and citations omitted); *see also Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir. 1996) ("Involuntary commitment to a mental institution substantially restricts individual liberty in many respects."). Accordingly, the Court has held that a "State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself . . . ." *O'Connor v. Donaldson*, 422 U.S. 563, 576 (1975). Accordingly, state laws have been interpreted to require a finding of dangerousness before an individual can be committed. *See, e.g.*, *Glass*, 984 F.2d at 57.

The "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting

*Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Due process "is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334. To determine the process due, courts look at three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335.

Applying *Mathews* to the question of the burden of proof required for involuntary civil commitment, the Supreme Court has noted that it "is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual." *Addington v. Texas*, 441 U.S. 418, 425-26 (1979). The Court also noted that the "state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill." *Id*. at 426. Addressing the rights of prisoners involuntarily transferred to mental facilities, the Supreme Court approved of a district court's requirement that prisoners be provided written notice of the transfer, a hearing, opportunity at the hearing to present testimony of witnesses, an independent decisionmaker, a written statement as to the evidence relied upon and reasons for transfer to mental hospital, legal counsel, and effective notice of the foregoing rights. *Vitek*, 445 U.S. at 494-95; *see also Doe ex rel. Doe v. Austin*, 848 F.2d 1386, 1393-94 (6th

Cir. 1988) (taking *Vitek* as guidance in identifying procedures required for involuntary commitment of mentally retarded adults).[5]

Simon's claim is not that the entire chapter 202A scheme fails to provide due process. Rather, he argues simply that due process requires that written documentation from the officer be retained. This argument is also unpersuasive. Importantly, upon presentment of the allegedly mentally ill individual, the physician makes her own independent evaluation of the patient. In this case, Dr. Goldstein noted that she had reviewed the Uniform Citation and Adult Case Summary provided by the police, but as the district court found, "her evaluation was done independently from what the police do and her decision was based on Simon's mental status at the time of his evaluation." The statute is quite clear that, "[i]f after evaluation, the qualified mental health professional finds that the person does not meet the criteria for involuntary hospitalization, the person shall be released *immediately . . . .*" KY. REV. STAT. ANN. § 202A.041(1) (emphasis added). Since the doctor's evaluations are independent, retaining an officer's citation adds little or nothing to the process of admitting someone involuntarily.

Moreover, the retention of an officer's citation has no bearing on the constitutional adequacy of the qualified mental-health professional's independent examination. As the Second Circuit has stated, "due process does demand that the decision to order an involuntary emergency commitment be made in accordance with a standard that promises some reasonable degree of accuracy."

---

[5]In approving of the requirements formulated by the district court, the Supreme Court did not hold that those requirements were mandatory. The Court merely said that the district court's list of requirements sufficed under *Mathews* to meet the needs of due process. *Vitek*, 445 U.S. at 494-95.

*Rodriguez v. City of New York*, 72 F.3d 1051, 1062 (2d Cir. 1995). However, Simon is not challenging Kentucky's standard for involuntary emergency commitment, and the retention of an officer's citation has no bearing on the adequacy of that standard or its application. We note that under Section 202A.041, allegedly mentally ill individuals receive all of the due process protections the Supreme Court approved in *Vitek*, except for legal counsel and the opportunity to call witnesses to contest the initial involuntary hospitalization. The omission of legal counsel and the right to call witnesses makes sense since the decision to hospitalize is being made in response to an immediate presentment of an individual and is only going to last 72 hours. Additional procedures, the adequacy of which Simon does not challenge, are required following the initial decision to hold an individual for 72 hours. *See* KY. REV. STAT. ANN. §§ 202A.031(2), 202A.051.

Thus, even though individuals have a strong interest in not being erroneously committed, there is almost no added value to requiring retention of officer citations as part of the process for 72-hour emergency commitment. Moreover, retaining such reports has no bearing on Kentucky's standards, which Simon does not challenge, for involuntary emergency commitment. Therefore, we hold that the statute's failure to require retention of an officer's citation is not a constitutional defect.

## D. Psychotherapist-Patient Privilege

Finally, Simon claims that the district court's decision to allow discovery of his psychotherapist-patient communications violated the attendant privilege. The district court adopted the magistrate judge's ruling that, because Simon had placed his mental health in issue, he had waived the privilege. The district court also ordered that any confidential records be placed under

- 23 -

seal.

The Supreme Court has recognized a federal-common-law psychotherapist-patient privilege, holding that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996). The Court also noted that, "[l]ike other testimonial privileges, the patient may of course waive the protection." *Id*. at 15 n.14. The Court did not say explicitly, however, whether the privilege is waived if a plaintiff puts his mental health at issue. However, this circuit has held that placing one's mental health at issue constitutes waiver of the privilege. *See Maday*, 480 F.3d at 821 (holding privilege waived when plaintiff sought mental-health damages); *see also Schoffstall*, 223 F.3d at 823 ("a plaintiff waives the psychotherapist-patient privilege by placing his or her medical condition at issue").

In this case, it is undisputed that the privilege attached to Simon's communications with Dr. Goldstein. However, the privilege was waived. Simon's case against Officer Cook and the LFUCG hinges on whether Cook acted with probable cause when he detained Simon. That determination, in turn, depends on whether Cook had probable cause to believe that Simon was mentally ill and dangerous. Clearly, Simon's case placed his mental state at issue. Although only Cook's impressions are part of the probable cause inquiry, not Dr. Goldstein's later conclusions, Dr. Goldstein's later communications from Simon may inform our analysis of whether Cook's view of Simon's mental state on the day of his detention was objectively reasonable. Therefore, Simon's suit waived the privilege.

**IV**

Therefore, for the reasons set out above, we AFFIRM the district court's grant of summary judgment.