NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0376n.06

No. 22-5232

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 15, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| NICHOLAS MORROW, | ) | |
|     Plaintiff-Appellant, | ) | |
| v. | ) | |
| METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY, TENNESSEE; TOMMY WIDENER; ANDREW KOOSHIAN; NICHOLAS KULP; MARCUS DARDEN; RYAN STORM; BRITTANY MCELWEE; EDIN PLANCIC; NICHOLAS CARROLL; JEDIDAYAH MERRIWEATHER; VANDERBILT UNIVERSITY MEDICAL CENTER, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE<br><br>OPINION |
|     Defendants-Appellees. | ) | |

Before: SUTTON, Chief Judge; CLAY and BUSH, Circuit Judges.

JOHN K. BUSH, Circuit Judge. After Nicholas Morrow posted threatening statements on Facebook, two people called the Metropolitan Nashville Police Department to report the statements and express concern about Morrow's well-being. In response, police officers went to Morrow's residence, but he refused to speak with them. Knowing that Morrow had experienced past difficulties with the police and suffered from post-traumatic stress disorder, the officers brought in mental health professionals to evaluate the situation. That eventually led to Morrow's detention for a mental health evaluation, which resulted in his admission to Vanderbilt University Medical Center for evaluation and treatment. A judicial commissioner for the general sessions court in Nashville signed an order approving Morrow's admission to the hospital.

Afterwards, Morrow filed suit against the Metropolitan Government of Nashville, several police officers, and Vanderbilt University Medical Center (VUMC). Against the government defendants, he alleged Fourth and First Amendment violations along with a state-law trespass claim, claiming that the officers lacked probable cause for his arrest or arrested him as retaliation for his statements on Facebook. Against VUMC, he alleged false imprisonment and negligence per se claims for confinement without a valid court order. The district court granted summary judgment to all defendants and declined to exercise supplemental jurisdiction over the remaining state-law trespass claim.

We AFFIRM the district court's judgment because none of Morrow's arguments prevail against any of the defendants.

## I.

At 1:51 p.m. on April 29, 2018, Morrow posted on Facebook: "Keep tuned. I got some surprises." A few minutes later, he posted: "At 4:00 p.m. Nashville will change." He had also previously claimed in this thread of posts that "the VA have murdered veterans."

Until the spring of 2018, Morrow was a student at Nashville State Community College (Nashville State). Chase Taylor, the husband of a Nashville State professor, saw Morrow's posts and called Metropolitan Nashville Police Department (MNPD) dispatch to express his concern. Taylor told a dispatcher that Morrow was posting threats on Facebook. The dispatcher's report reflected that, according to Taylor, Morrow was supposed to take an exam at Nashville State at 4:00 p.m. that day.

Also that afternoon, Kimberly Cates, Morrow's high school and Nashville State classmate, called the police dispatcher to express concern about Morrow's Facebook posts and his mental state. Cates told the dispatcher that Morrow had severe post-traumatic stress disorder (PTSD) and

had served in the military. She feared that Morrow would harm a professor at Nashville State and possibly commit a school shooting. The dispatcher sent a summary of Cates's and Taylor's calls to MNPD officers that afternoon.

Sergeant Brittany McElwee and Officer Marcus Darden, MNPD officers, spoke with Cates and then sent an officer to investigate the potential threat at Nashville State. Officers determined Morrow's address, and Sergeant McElwee, Officer Darden, and Officer Jedidayah Merriweather went to his residence. Other MNPD officers (including Sergeant Andrew Kooshian, Sergeant Nicholas Kulp, Officer Edin Plancic, and Officer Ryan Storm) later responded to the same address. The officers were told by MNPD dispatch that Morrow was a veteran with PTSD who was making threatening statements about a professor at Nashville State. The dispatcher also informed officers that Morrow previously threatened police and that any response to his home should involve at least two officers.

When police arrived, Morrow refused to acknowledge their welfare check. So Sergeant McElwee ordered officers to set up a perimeter to prevent Morrow from leaving the scene and harming himself or someone else. Sergeant McElwee then notified Captain Tommy Widener and Mobile Crisis, an organization that provides mental health crisis services, about what was happening at the house.

Shortly after that, Morrow's mother (Ms. Morrow) arrived. She owned the home where she and Morrow lived. Earlier that day, Morrow told his mother she needed to leave the house since he was planning something and did not want her to get caught up in it. Because he had never asked his mother to leave the house before, she decided to leave. Mobile Crisis called Ms. Morrow to express that the situation with her son "could get bad" because "we're going to have to talk to

him, and he won't let us in."  Carolyn Morrow Dep., R. 108-8, PageID 921.  At the request of Mobile Crisis,  she returned to the house to let the police inside.

Once at the house, Ms. Morrow told officers that there was a loaded revolver on her nightstand and possibly other guns inside the house.  And, indeed, there was a loaded revolver in the home, along with a shotgun and two boxes of ammunition in Morrow's room.  Ms. Morrow told Captain Widener that Morrow was very upset with Professor Ian Bourgoine because he had publicly embarrassed her son at Nashville State.

Ashley Yarbrough, the Mobile Crisis counselor who responded to the scene, arrived around 6:15 p.m.  As part of her job responsibilities, she conducts mental health assessments.  To that end, Yarbrough called Cates, Morrow's former classmate, who seemed concerned.  Yarbrough also called Professor Bourgoine, who told her that he feared for his life.  Yarbrough perceived their concerns as genuine and did not think they were overreacting.

Yarbrough then went to Morrow's Facebook page and saw that he had recently posted more statements on Facebook from inside his house.  In her professional judgment, she believed the posts were created in a manic fashion.  She also had access to records documenting an incident with police at Morrow's home in 2016.  And Yarbrough spoke to Ms. Morrow, who told Yarbrough that her son said he was going to "fix the Nashville State problem the only way he knew how and that his mom should stay away until he was done."  That guns were in the house also concerned Yarbrough.

Michael Randolph, Yarbrough's supervisor, also responded to the scene.  He and Yarbrough spoke about the information she gathered and agreed that she should sign a 6-401 form. The 6-401 form is a routinely used document in Nashville that instructs law enforcement to produce a person for a face-to-face mental health evaluation, and a 6-404 form allows for someone

to be taken, by police, to a hospital for a mental health assessment. Mental health professionals, not police officers, typically complete these forms. Yarbrough signed the form so that officers would produce Morrow for her to conduct a face-to-face mental health evaluation.

Supervisors then informed the other officers on the scene that a 6-401 form had been signed and to detain Morrow for a mental health evaluation. After sunset, Morrow opened the porch door to let a dog out. Sergeant McElwee moved forward to calm and secure the dog, while Officers Carroll, Darden, Merriweather, and Storm advanced toward the house to cover Sergeant McElwee. Morrow then emerged from the house while shouting, cursing, and waiving his arms frantically at the officers. The officers directed Morrow to step off the porch with his hands up, but he ignored those commands. Morrow turned to go back inside. The officers knew, from Morrow's mother, that he had access to at least one gun in the house. So Officer Darden used a taser to stop him.

Yarbrough tried to speak with Morrow, but he shouted about how he would sue everyone. Morrow also claimed he had a large sum of money and insisted he was being tracked by unknown people—statements Yarbrough perceived to be delusional and grandiose. So Yarbrough ultimately concluded that Morrow posed a danger to himself and potentially others, which would require a mental health assessment from a physician. Yarbrough signed a 6-404 form in order to take Morrow to a hospital for a mental health assessment by a doctor to determine whether he should be involuntarily committed.

At 9:49 p.m., Morrow arrived, with the police, at the emergency department of VUMC. There, he was evaluated by VUMC providers, leading to his involuntary admission for mental health treatment.

At 2:08 p.m. the next day, the General Sessions Court for Davidson County (general sessions court), through a judicial commissioner on the night court[1], entered an order requiring Morrow's involuntary admission to VUMC until a probable cause hearing could occur on May 4, 2018, four days after that order. At the probable cause hearing, held on May 4, the general sessions court extended Morrow's involuntary admission to VUMC and determined that Morrow's involuntary admission could continue—if needed—until May 19. But he was discharged from VUMC on May 11.

On April 29, 2019, a year after the events in question, Morrow filed suit against Captain Widener, Sergeant Kooshian, and Sergeant Kulp (collectively, officer defendants), alleging, under 42 U.S.C. § 1983, claims of Fourth Amendment excessive force, warrantless entry, and false arrest claims and a First Amendment retaliatory arrest claim. Morrow asserted the same constitutional claims against the Metropolitan Government of Nashville (Metropolitan Government) under a theory of municipal liability. He additionally alleged a state-law trespass claim against the officers on the scene, and false imprisonment and negligence per se claims against VUMC.

All defendants moved for summary judgement. The district court first granted VUMC summary judgment, holding that (1) the general sessions court order was valid and based on probable cause and (2) even if the general session court order was invalid, VUMC could rely on that order in good faith. *Morrow v. Metro. Nashville of Davidson Cnty.*, No. 3:19-cv-00351, 2022 WL 330974 (M.D. Tenn. Feb. 3, 2022). In a separate opinion, the district court granted summary judgment for the officer defendants and the Metropolitan Government, finding no First or Fourth

---

[1] The record demonstrates that the general sessions court for Davidson County has established a division known as the night court, which is "on duty 24 hours a day, 365 days a year" and handles various court functions, including "[d]etermin[ing] probable cause for judicial committals from county psychiatric facilities." R. 104-8, PageID 678.

Amendment violations and, in any event, qualified immunity would apply. *Morrow v. Metro. Nashville of Davidson Cnty.*, No. 3:19-cv-00351, 2022 WL 884848 (M.D. Tenn. Mar. 24, 2022). The district court also declined to exercise supplemental jurisdiction over the state-law trespass claims. Morrow timely appealed.

## II.

We review a grant of summary judgment de novo while viewing the factual evidence in the light most favorable to the non-moving party and drawing reasonable inferences in the non-movant's favor. *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022). Summary judgment is warranted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.*; Fed R. Civ. P. 56(a). "A dispute of a material fact is genuine so long as 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006)).

## A.

As discussed below, Morrow's Fourth Amendment claims—for excessive force, warrantless entry, and false arrest—fail because the officer defendants reasonably believed that Morrow was likely to harm himself or others.[2] Thus, they had probable cause to enter Morrow's yard, remain there until mental health professionals could assess his behavior, and detain him on his porch for a mental health assessment.

---

[2] We need not address the officer defendants' qualified immunity defense because Morrow cannot show a constitutional violation occurred.

"[I]n the context of a mental health seizure an officer must have probable cause to believe that the person seized poses a danger to himself or others," as analyzed under the probable cause standard announced in *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997). *Fisher v. Harden*, 398 F.3d 837, 842–43 (6th Cir. 2005). This standard "requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." *Monday*, 118 F.3d at 1102 (quoting *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983)). So "a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition." *Id.* "Because 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts,'" a court should put itself in the shoes of a reasonable and objective officer on the scene. *Id.* (quoting *Gates*, 462 U.S. at 232).

Here, the facts showed that Morrow posed a high risk of danger to himself and possibly others. Morrow threatened his professor, suffered from PTSD, had access to at least one weapon, previously had made threats to police officers, and refused to speak to officers completing a welfare check. These circumstances gave the officers probable cause to detain him. *See id.*; *United States v. Evans*, 581 F.3d 333, 342 (6th Cir. 2009) ("Probable cause requires officers to 'show more than mere suspicion' but 'does not require that they possess evidence sufficient to establish a prima facie case at trial.'" (quoting *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998))). The district court correctly weighed the totality of the circumstances to conclude that the officer defendants had probable cause to detain Morrow for a mental health assessment. Given the circumstances presented, a reasonable and objective officer on the scene would believe Morrow posed a threat to others or himself. *Ziegler v. Aukerman*, 512 F.3d 777, 784 (6th Cir. 2008) ("It is enough that [the officer] had information such that a reasonable person in the officer's position would believe it probable that [Morrow] was a danger to [him]self or others.").

The leading case in this circuit governing probable cause for mental health seizures is *Monday*, 118 F.3d 1099. *Monday*, like this case, involved a mentally ill person's detention against his will by law enforcement. *Id.* at 1101. The *Monday* court analogized a dangerous mental condition to criminal activity in the Fourth Amendment context, even without directly addressing exigent circumstances. *Id.* at 1102. "Thus, so long as an officer has probable cause to believe that an individual is dangerous, a warrant is not required in this circuit for a mental-health seizure." *Simon v. Cook*, 261 F. App'x 873, 882 (6th Cir. 2008). Under the standard announced in *Monday*, no Fourth Amendment violation occurred here. Simply put, Morrow displayed obvious mental health struggles that prompted the police officers' actions, thus establishing probable cause to detain him.

Even though Morrow argues otherwise, this court has also routinely recited the *Monday* mental health detention standard without mentioning the need for exigent circumstances, even when the police barged into a plaintiff's home with no warrant. *Rudolph v. Babinec*, 939 F.3d 742, 747 (6th Cir. 2019) (per curiam); *see also Gradisher v. City of Akron*, 794 F.3d 574, 578–80, 584–85 (6th Cir. 2015) (holding that it was not clearly established that officers could not forcibly enter plaintiff's home where officers received information that he "made several drunken and abusive phone calls to 911," had an outstanding warrant for failure to appear, had issued a "subtle threat to another patron about having a gun," and "bolted his front door and retreated into his back door when he was spotted coming out from there" after officers arrived).

Finally, as to Morrow's excessive force claim, the Supreme Court has held that the use of deadly force was not excessive force when an officer believed a suspect posed "a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Given this authority, and given Morrow's erratic behavior and access to at least one weapon, the officers did not use excessive force against Morrow by tasing him to detain him.

**B.**

Since the officers had probable cause to detain Morrow, Morrow's First Amendment claim—that he was arrested as retaliation for his Facebook posts—must fail. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) ("The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest.").

Even if Morrow could demonstrate a lack of probable cause, he "'must [then] show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation.'" *Id.* at 1725 (quoting *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1952–53 (2018)). Morrow falls short on those requirements as well. There was no evidence in the record that the officer defendants were motivated to retaliate against Morrow because of his speech; rather, the officers acted in response to multiple phone calls reporting Morrow posing threats to himself and others.

**C.**

Because Morrow fails to show any constitutional violation, municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), cannot attach to the Metropolitan Government.

"The question of whether a municipality is liable under § 1983 has two parts: '(1) whether [the] plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.'" *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 449 (6th Cir. 2011) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)).

Accordingly, "there is no liability under *Monell* without an underlying constitutional violation." *Zucker v. City of Farmington Hills*, 643 F. App'x 555, 570 (6th Cir. 2014) (citing *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). Lacking a viable constitutional claim against the officer defendants as discussed above, Morrow also has no viable *Monell* claim against the Metropolitan Government either.

**D.**

As for the false imprisonment and negligence per se claims against VUMC, VUMC was entitled to rely on the facially valid order when admitting Morrow, so these claims do not succeed.

In his principal brief on appeal, Morrow failed to challenge the district court's ruling that VUMC was entitled to rely on the general sessions court order to admit Morrow. As a result, Morrow waived the argument, notwithstanding Morrow's attempt to raise it for the first time in his reply brief. *See Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021) ("Generally, an 'appellant abandons all issues not raised and argued in its initial brief on appeal.'" (quoting *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 540 (6th Cir. 2014))).

Although Morrow argues that the night court lacked the authority of the general sessions court to order his involuntary admission at VUMC, he points to no opinion from any Tennessee court or this court holding that the judicial commissioners of the night court do not have the authority to issue orders on behalf of the general sessions court. In any event, the district court's reasoning regarding reliance was correct. VUMC can rely on a facially valid order to involuntarily admit a patient. *Hood v. Jenkins*, 432 S.W.3d 814, 827 (Tenn. 2013) ("[P]arties have the right to act in reliance upon orders of a court without being subject to a later claim for damages in the event the court or its officers were in error, as long as the parties did not direct or ratify the wrongful acts." (cleaned up) (quoting *Hawley v. Lavelle*, 602 S.W.2d 499, 502 (Tenn. Ct. App. 1980))).

**III.**

Finally, Morrow asks that, at a minimum, the case be remanded for consideration of the state-law trespassing claim. But the district court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). This court reviews a decision not to exercise supplemental jurisdiction under the abuse-of-discretion standard. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (citing *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009)). And it is a "'fundamental principle' that 'declining to exercise supplemental jurisdiction over an action with no remaining federal claims is not an abuse of discretion.'" *Golf Vill. N., LLC v. City of Powell*, 14 F.4th 611, 624 (6th Cir. 2021) (quoting *Southard v. Newcomb Oil Co.*, 7 F.4th 451, 453 (6th Cir. 2021)).

Having dismissed all federal claims, the district court properly declined to exercise supplemental jurisdiction over Morrow's state-law trespass claims. *See id.* Because the district court decided not to exercise supplemental jurisdiction, it never reached the merits of the state-law claim. And neither will this court. *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."). Morrow provided no argument or authority to show that the district court abused its discretion.

**IV.**

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment for all defendants.