RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0013p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

BRANDI BOOTH, Administratrix of the Estate of Dustin
Booth,

                           *Plaintiff-Appellant*,

    *v.*

JONATHAN LAZZARA, DO,

                           *Defendant*,

ROBERT BUCHANAN; MIKE ROSENBALM; BRIAN
CURLIS; FRED DOUGHMAN; DREW ASPACHER; CITY OF
MONROE, OHIO,

                       *Defendants-Appellees*.

No. 24-3894

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:22-cv-00197—Michael J. Newman, District Judge.

Argued: June 12, 2025

Decided and Filed: January 14, 2026

Before: McKEAGUE, MURPHY, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Konrad Kircher, KIRCHER LAW LLC, Cincinnati, Ohio, for Appellant. Dawn M. Frick, SURDYK, DOWD & TURNER, Dayton, Ohio, for Appellees Buchanan, Rosenbalm, Curlis, Aspacher, and City of Monroe. Katherine L. Barbiere, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Mason, Ohio, for Appellee Doughman. **ON BRIEF:** Konrad Kircher, KIRCHER LAW LLC, Cincinnati, Ohio, for Appellant. Dawn M. Frick, Jeffrey C. Turner, Christopher T. Herman, SURDYK, DOWD & TURNER, Dayton, Ohio, for Appellees Buchanan, Rosenbalm, Curlis, Aspacher, and City of Monroe. Katherine L. Barbiere, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Mason, Ohio, for Appellee Doughman.

    MURPHY, J., delivered the opinion of the court in which McKEAGUE and DAVIS, JJ., concurred. MURPHY, J. (pp. 18–26), also delivered a separate concurring opinion.

---

**OPINION**

---

MURPHY, Circuit Judge.  This case's tragic facts raise questions under the Americans with Disabilities Act (ADA) and the Fourth Amendment to the U.S. Constitution.  After Dustin Booth began to suffer from mental illness, his wife called the police for help.  But Booth ended up barricading himself in his house.  And when the police later stopped a truck in which Booth was traveling, he brandished a firearm.  That action led to his fatal shooting.  Booth's wife now argues that the police violated the ADA because they did not accommodate his disability when trying to detain him.  And she argues that they violated the Fourth Amendment because they unreasonably stopped the truck and unreasonably used a police dog and takedown maneuver.  But the district court found that Mrs. Booth's proposed ADA accommodation was not reasonable because of the safety risks that Booth posed.  And it held that the police actions were reasonable for the same reason.  The court thus rejected these claims at the summary-judgment stage.  We agree and affirm.

I

A

Booth met his wife Brandi at their high school in Monroe, Ohio.  The couple eventually got married and had two kids.  After high school, Booth got an associate's degree in business management from Miami University.  He later obtained a job operating a crane at AK Steel.  And he ran a business on the side cleaning the exterior of houses.  Booth was a reliable employee for AK Steel, calling in sick perhaps once or twice over twelve years.  He was also a dedicated father, enjoying fishing and playing basketball with his sons.  For most of his life, Booth did not suffer from any apparent mental illnesses.

But Booth's mental health took a dramatic turn in January 2022.  Before then, he drank beer almost every day.  But he quit in October 2021.  That month, Booth smoked marijuana for the first time in years while visiting friends.  He switched from drinking alcohol to vaping THC at his wife's request that he pick one habit or the other.  By the following January, Booth was

vaping "nonstop," even while "driving" and in the "shower." Booth Dep., R.59, PageID 295, 308.

Soon after Booth started vaping, he began to act bizarrely. He became convinced that the "world was flat," "obsess[ed] over maps," and created a "notebook" full of them. *Id.*, PageID 294, 303, 429. On January 31, Booth's wife refused to give him this notebook as he left for work. In retaliation, Booth "smacked [her] in the face"—the first time he ever struck her. *Id.*, PageID 294. Later that day, Booth's wife contacted her mother concerned about his THC use. Her mother, in turn, called Booth and had an "unsettling conversation" with him. Price Dep., R.76, PageID 2053. A "delusional" Booth claimed to be the "chosen one" and to have "all the answers to the world." *Id.*, PageID 2054.

Booth's wife and mother-in-law reached out to their family doctor, who suggested that they call the police about his odd behavior. Yet Booth seemingly learned of their plans because he did not come home that night and instead visited with his mom and a friend. After getting into a fight with his mom, Booth made it home early in the morning on February 1. His wife immediately went outside to speak with him and asked his mom to call the police. Officers with the Monroe Police Department, including Fred Doughman, responded. Booth did not resist the officers. Still, they "could tell that something was not right with his thought process." Doughman Dep., R.63, PageID 1066. They took him to the emergency room at the request of a mobile-crisis unit.

An emergency-room doctor diagnosed Booth with "drug-induced psychosis" from his vaping. Booth Dep., R.59, PageID 328. So the hospital transferred Booth to a behavioral-health unit. Yet the director of psychiatry, Dr. Jonathan Lazzara, had a different diagnosis. He opined that Booth suffered from bipolar disorder with mania. Booth began to take medication. Although his wife thought he remained unconnected to "reality" during his hospital stay, *id.*, PageID 344, 426, Dr. Lazzara concluded that the medicine had helped Booth enough to discharge him on February 7.

Unfortunately, Booth refused to take his medication and resumed vaping THC when he got home. Two days after his release, he tried to drive an hour away to buy a new truck. But his

wife hid his keys because she did not think he should drive that far or make such a big investment in his condition. Booth responded by "smashing [her] cell phone with a hammer" and calling the police. *Id.*, PageID 381. His wife grabbed the phone from him and asked the police to come. Several officers arrived. Booth and his wife told the officers that he was not a threat to himself or others, but his wife begged them to take him back to the hospital. Without evidence that Booth would harm anyone, though, the officers declined.

His behavior spiraled downward the next two days. On February 10, Booth drove to the out-of-town dealer and bought a new truck. Then, on February 11, he engaged in the strangest conduct to date. His wife heard from a concerned relative that Booth had (among other things) picked up a stranger at a bank and tried to give his truck away. On her way home from an appointment, she spotted Booth driving around the neighborhood "blaring music real loud with the windows down." Booth Dep., R.60, PageID 566. He got out of the truck, did a "goofy dance," and threw money out the window at a neighbor. *Id.*, PageID 566–67. Booth's wife picked up the money and followed him as he then "obsessively" "honk[ed] his horn" while driving round in circles in a cul-de-sac. *Id.*, PageID 567. When he later walked into a neighbor's garage, she called 911 feeling like their "whole world was . . . crashing" down. *Id.*, PageID 567–68. She now told the dispatcher that she believed Booth was, in fact, a danger to himself and others and might have a gun. He had a concealed-carry permit, regularly kept a gun in his truck, and had access to many other guns at their home.

Officer Drew Aspacher with the Monroe Police Department responded to the call. When Aspacher saw Booth's truck, he turned on his patrol car's lights to stop Booth. As Booth drove toward the patrol car, Aspacher also got out and told him: "Hold on a second. I want to talk to you, okay?" Video 0:00:09–00:12. Booth declined to stop and told Aspacher to meet him at his house. Aspacher followed him there. When they arrived, Aspacher again asked Booth to walk toward him. Booth went into his house instead. He then ignored orders to come out.

A standoff ensued over several hours into the evening. Other officers arrived and set up a perimeter around the house. A mental-health unit and negotiators also came to the scene. And other members of Booth's family gathered outside.

The officers believed that Booth remained "manic" in the home. Curlis Dep., R.66, PageID 1409. During the standoff, Booth's mother-in-law opined to a crisis-intervention specialist that he was a threat to her daughter and grandchildren. At one point, a shirtless Booth also came to the front door. He had "written all over [himself] with a marker" and carried a revolver in a Western-style holster that "you'd take to a gunfight." Duh Dep., R.74, PageID 1942. At another point, Booth told an officer that he "wanted his kids to be lined up in front of him" and that "his wife would not be his wife for very much longer." Debrief, R.62-1, PageID 1030; Lyman Dep., R.68, PageID 1603.

Robert Buchanan, the City of Monroe's Chief of Police, developed a gameplan with the help of other officers. Because the officers knew that Booth possessed a gun, they believed it was too dangerous to force their way inside to take him to the hospital. Chief Buchanan thus made the decision "to pull back from the house" to "de-escalate the situation" in the hope that Booth would calm down. Buchanan Dep., R.62, PageID 933, 938–39. Most of the officers headed back to the station for a debriefing, but some detectives remained at Booth's home in an unmarked car. The officers planned to let Booth stay in the home. If he left, however, they would "try to detain" him to take him to the hospital for help. Curlis Dep., R.66, PageID 1413, 1420.

In the meantime, one of Booth's longtime friends, Justin Duh, learned of the standoff. Duh drove to Booth's home out of concern for his friend. After speaking with Booth's family, Duh decided he would try to calm Booth down by picking up marijuana to share with him. According to Brian Curlis, a captain in the Monroe Police Department, the police told Duh that they could not stop him from entering the home but that he should exercise caution.

When Duh returned to Booth's home after obtaining marijuana, the police had all left except for the unmarked car. Booth, who still had writing on his body, let Duh into the home. Duh could tell that Booth "needed help." Duh Dep., R.74, PageID 1969. Among other beliefs, Booth told Duh that he "couldn't trust anybody" and talked about "being God" and "being in charge of the world." *Id.*, PageID 1960, 1966. Booth had also removed firearms from a gun cabinet and stacked them (along with Nerf guns) all around the house. When Booth smoked the marijuana, he became more relaxed. Duh later drove to get pizza. Booth's wife put Duh in

touch with a detective at the scene while he picked up the food.  The detective told Duh that they wanted Booth to leave the house so they could pull him over and take him to the hospital.

After Duh and Booth ate the pizza, Booth decided to visit his sister.  Duh volunteered to drive him.  But Booth refused to leave without a gun and placed his revolver in the backseat of Duh's truck.  Duh thus informed the detective that they were leaving and that Booth had a gun.

As these events unfolded, Lieutenant Michael Rosenbalm arrived at the station to manage the overnight shift.  When Rosenbalm learned of Booth's pending departure from his home, he decided that officers should pull Duh's truck over to take Booth to the hospital.  He also instructed Doughman, a K-9 officer, "to show his dog" as a "display of force" to get Booth to comply but not to "send the dog" to restrain Booth.  Rosenbalm Dep., R.67, PageID 1521–22.

Officers pulled Duh's truck over a short time later.  Duh tried to persuade Booth to "see what they want" without confronting them.  Duh Dep., R.74, PageID 1991.  Booth instead went for the gun.  Duh tried to stop him, and the two friends "wrestled over the center console of the truck."  *Id.*  When Booth got the upper hand, Duh jumped out of the truck and yelled that Booth had a gun.

Doughman stood near Duh's truck to display his police dog.  He witnessed Booth moving inside the truck.  He also heard Duh yell about the gun and another officer ask Duh if Booth had stabbed him.  And Doughman watched Booth get out of the truck and start walking away from the officers toward a busy intersection with open businesses.  The officers repeatedly ordered Booth to "get down" or "come back" to "get his attention."  Doughman Dep., R.63, PageID 1086.

Booth's failure to heed these commands led to the fatal encounter.  Doughman decided to release his dog to stop Booth.  But the dog "went right past" Booth and did not reengage because of all the shouting in what quickly turned into a chaotic scene.  *Id.*, PageID 1090.  Doughman thus chose to go "hands-on" himself to "take [Booth] down to the ground[.]"  *Id.*  Before Doughman grabbed Booth, a sergeant shouted "[n]o, no, no" and "don't fight him."  Myers Dep., R.61, PageID 764.  But "everything happened so fast" that Doughman "already made contact" with Booth before he processed the "no, no, no" remark.  Doughman Dep., R.63, PageID 1111.

(He did not hear the sergeant say not to fight Booth.)  Booth resisted Doughman's efforts to restrain him while stating that he did not want to hurt anyone.  Doughman quickly took Booth to the ground, but Booth slipped free of his control and brandished his revolver as he got back up.  This action led several officers to shoot him.  Booth died later that night.

B

Booth's wife brought this suit on behalf of his estate.  She did not challenge the ultimate use of lethal force.  Instead, she challenged decisions leading up to that tragic moment.  Mrs. Booth alleged that the City of Monroe failed to accommodate Booth's disability in violation of the ADA because it did not properly train its officers on how to take a mentally ill person into custody for hospitalization.  Next, she brought constitutional claims under 42 U.S.C. § 1983.  She alleged that several officers unreasonably seized Booth in violation of the Fourth Amendment when they stopped him without reasonable suspicion.  And she alleged that Doughman used excessive force in violation of the Fourth Amendment by releasing his police dog to apprehend Booth and by using a take-down maneuver on him.  She also sued various supervising officers for failing to adequately train and supervise their subordinates or for ratifying their allegedly improper conduct.  Lastly, Mrs. Booth brought state-law negligence claims against Dr. Lazzara and wrongful-death and survivorship claims against all the defendants.

The district court rejected Mrs. Booth's federal claims at the summary-judgment stage. *See Booth v. Lazzara*, 2024 WL 4363213, at *8–15 (S.D. Ohio Sept. 30, 2024).  Starting with the ADA claim, the court assumed that this law might regulate some traffic stops but held that it did not apply to Booth's arrest because of the danger he posed. *Id.* at *12–13.  Turning to the § 1983 claims, the court held that the officers had not violated Booth's rights under the Fourth Amendment when stopping or detaining him. *Id.* at *9–11, *14–15.  That holding also doomed all the claims against the supervising officers. *Id.* at *11.  After rejecting the federal claims, the court declined to exercise supplemental jurisdiction over the state-law claims. *Id.* at *15.

II

On appeal, Mrs. Booth seeks to rejuvenate three of her claims.  She challenges the district court's rejection of her ADA claim against the City of Monroe, her unreasonable-seizure claim against the officers who stopped Booth, and her excessive-force claim against Doughman.  We review her arguments de novo.  *See Gambrel v. Knox County*, 25 F.4th 391, 399 (6th Cir. 2022).

A.  ADA Claim

Booth first seeks to hold the City of Monroe liable under Title II of the ADA.  Title II provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  We have held that this text regulates covered governments in two different ways.  *See Jones v. City of Detroit*, 20 F.4th 1117, 1119 (6th Cir. 2021).  Most obviously, the text prohibits governments from engaging in "intentional discrimination" against the disabled.  *Id.*  And even if neutral policies do not discriminate against the disabled, the text sometimes requires governments to make "reasonable accommodation[s]" to those policies.  *Id.*; *see Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017); *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907–13 (6th Cir. 2004); *see also* 28 C.F.R. § 35.130(b)(7)(i).

Mrs. Booth pursues only a reasonable-accommodation claim.  She asserts that the Monroe officers who attempted to detain Booth on the evening of February 11 used "aggressive, escalatory action," such as displaying a barking police dog and shouting conflicting commands.  Appellant's Br. 24–25.  As her proposed accommodation, she argues that the officers should have tried to "deescalate" their confrontation with Booth while arresting him.  *Id.* at 25.

Before reaching the merits of this claim, we start with two disclaimers about issues we need not decide.  Disclaimer One: It is not obvious that § 12132's text reaches the way that police make otherwise lawful arrests.  *Cf. City and County of San Francisco v. Sheehan*, 575 U.S. 600, 608–10 (2015); *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000).  As in other cases, we will simply "assume" that the ADA might regulate this law-enforcement conduct.  *Wilson v. Gregory*, 3 F.4th 844, 860 (6th Cir. 2021); *Roell*, 870 F.3d at 489; *see also Culp v.*

*Caudill*, 140 F.4th 938, 942–43 (7th Cir. 2025); *Gray v. Cummings*, 917 F.3d 1, 16–17 (1st Cir. 2019); *J.H. ex rel. J.P. v. Bernalillo County*, 806 F.3d 1255, 1261 (10th Cir. 2015).

Disclaimer Two: The ADA does not permit Mrs. Booth to hold the City of Monroe liable for its officers' misconduct under a vicarious-liability theory. *See Jones*, 20 F.4th at 1121–22. But her briefing does not object to any of the City's policies. To the contrary, she endorses the City's "guidelines" for police interactions with those suffering from "a mental health or emotional crisis" and criticizes the officers for allegedly failing to *follow* these guidelines when arresting Booth. Policies, R.62-1, PageID 1044. So how can she hold the City liable for its officers' actions?

We need not resolve either of these questions because Mrs. Booth has not identified a reasonable accommodation as a matter of law. Our cases make clear that an accommodation is not reasonable if it requires more than a "moderate" change to existing policies. *Doe by K.M. v. Knox Cnty. Bd. of Ed.*, 56 F.4th 1076, 1087 (6th Cir. 2023) (quoting *Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1037 (6th Cir. 1995)). The government thus need not make a change that "would fundamentally alter the nature of the" government "activity" at issue. 28 C.F.R. § 35.130(b)(7)(i). To decide whether a proposed accommodation qualifies as a modest or fundamental change, we have established a "fact-specific" test that considers the individual circumstances of each case. *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023) (quoting *Roell*, 870 F.3d at 489); *see Finley v. Huss*, 102 F.4th 789, 820, 821 (6th Cir. 2024). This case-by-case test often finds accommodations unreasonable when they would invade the rights of third parties—such as an accommodation that would require a mentally disabled prisoner to jump to the head of the line on a prison waitlist for a treatment program. *See Finley*, 102 F.4th at 822; *see also Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 492 (6th Cir. 2019).

When applying these principles to arrests, courts have held that officers need not adjust their policies for detaining individuals if "safety concerns" would arise from the change. *Wilson*, 3 F.4th at 860 (quoting *Roell*, 870 F.3d at 489); *see Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2008), *abrogated on other grounds as recognized by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015); *Thompson v. Williamson County*, 219 F.3d 555, 558 (6th Cir. 2000); *see also De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 899 (8th Cir. 2014); *Seremeth v. Bd.*

*of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 339–40 (4th Cir. 2012); *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1085–86 (11th Cir. 2007). That rule makes sense. A policy change that would require officers to take unsafe steps "would accommodate" an arrestee's disability "at the expense of" the rights of the police and bystanders who may get injured. *Finley*, 102 F.4th at 822. And safety qualifies as a "fundamental[]" aspect of an arrest. 28 C.F.R. § 35.130(b)(7)(i).

Our decision in *Roell* illustrates this approach. There, a mentally disabled man threw a flowerpot through his neighbor's window, causing the neighbor to call 911 and tell the dispatcher that the man was "acting crazy." *Roell*, 870 F.3d at 476. When the police arrived, the man moved aggressively toward the officers, swung a water hose at them, and refused to comply with their commands. *See id.* at 477. The officers had to repeatedly tase the man to get him under control. *See id.* at 477–78. He died while restrained. *See id.* at 478. The man's estate argued that the officers should have accommodated his disability by using "de-escalation techniques" before engaging with him. *Id.* at 489. But we found this proposed accommodation unreasonable as a matter of law because of the "exigent circumstances" that the officers faced. *Id.* Among other things, the officers arrived at an "unsecured scene" where an individual who "posed a continuing threat" to the police and third parties had just committed property crimes. *Id.*

The officers here faced the same kind of "exigent circumstances." *Id.* Recall what they faced when they tried to take Booth into custody during the traffic stop. Booth had behaved strangely for weeks. His wife and mother-in-law had both told the authorities that he now presented a threat to himself or others. Booth had also refused to stop for Officer Aspacher or speak to him when they got back to his house. He next refused to follow orders to come out of his house or to engage with mental-health employees. He had instead barricaded himself in his home and placed guns all around it. During the standoff, he had told an officer that he "wanted his kids to be lined up in front of him" and that "his wife would not be his wife for very much longer." Debrief, R.62-1, PageID 1030. He also had taken off his shirt, written all over himself, and begun to carry a revolver. And he had refused to leave his home without a firearm. These facts amply support the conclusion that Booth posed a "threat" when the officers attempted to take him into custody. *Roell*, 870 F.3d at 489. The officers thus were not required to

accommodate Booth's disability when following their usual procedures for high-risk situations like this one.

Mrs. Booth responds that there was no safety concern until the officers engaged in a "hostile, aggressive confrontation" with her husband during the traffic stop. Appellant's Br. 21. That claim ignores everything that preceded the stop. She herself had told the police that Booth posed a threat to himself or others. And his conduct at the house only confirmed this opinion. Mrs. Booth also criticizes the district court because its opinion suggested it did not "view" the video evidence of the various stops. Appellant's Br. 25. Yet we have viewed that evidence. And it does not compel a different conclusion than the one that we have reached: Booth objectively posed a safety risk, so the officers did not need to deviate from their policies for high-risk stops.

### B. Fourth Amendment Claims

Mrs. Booth next makes two claims under the Fourth Amendment. She argues that several officers violated Booth's constitutional rights when stopping him and that Officer Doughman violated his constitutional rights when trying to detain him. All the officers have responded by asserting a qualified-immunity defense. To rebut this defense, Mrs. Booth must show that the officers violated the Fourth Amendment and that then-existing precedent put this violation "beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (citation omitted). But she has failed to establish a constitutional violation at all—let alone an undisputed one.

1. *Traffic Stop*. Mrs. Booth first argues that the Fourth Amendment's protections against "unreasonable . . . seizures" prohibited the officers from pulling Duh's truck over to detain her husband. U.S. Const. amend. IV. She rightly notes that when the police pull over a car, they "seize" all its occupants. *See Brendlin v. California*, 551 U.S. 249, 251 (2007). The police thus must show that the seizure was reasonable. Typically, they make this showing by establishing reasonable suspicion or probable cause to believe that one of the car's occupants has committed a criminal offense or civil violation. *See United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021). But officers do not always need evidence of a legal violation to make a seizure reasonable. They can also seize individuals for mental-health evaluations—what we have called

"mental-health seizures"—if they have "probable cause" that the individuals "pose a danger to themselves or others." *Helms ex rel. Helms v. Boyd Cnty. Sheriff's Dep't*, 2025 WL 1693827, at *4 (6th Cir. June 17, 2025); *see Machan v. Olney*, 958 F.3d 1212, 1214 (6th Cir. 2020); *Ziegler v. Aukerman*, 512 F.3d 777, 783–84 (6th Cir. 2008); *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997).

The same probable-cause standards that govern criminal seizures apply to mental-health seizures. That is, officers must identify a "probability or substantial chance" that the seized individuals might engage in dangerous behavior that could injure themselves or other parties. *Monday*, 118 F.3d at 1102 (quoting *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983)). And courts must objectively evaluate whether a seizure meets this test "from the perspective of a reasonable" officer on the scene—not through the filter of hindsight. *Ziegler*, 512 F.3d at 783; *see Zucker v. City of Farmington Hills*, 643 F. App'x 555, 563 (6th Cir. 2016). We have held, for example, that officers had probable cause to believe that a man might harm himself or others when they learned from his daughter that he was delusional and possessed a gun. *See Zucker*, 643 F. App'x at 564.

In this case, too, the officers who stopped Duh's truck to take Booth to the hospital had probable cause to believe that he posed a risk of harm "to himself or others." *Monday*, 118 F.3d at 1102. This conclusion follows from all the same facts that show why Mrs. Booth sought an unreasonable accommodation under the ADA. Among other things, she had called 911 that afternoon, described Booth's odd conduct, and opined that he "posed a danger to himself and others around him." *Zucker*, 643 F. App'x at 564. The officers also observed that Booth was in a "manic" state from his behavior at home. *Id.* And he made statements about his wife and kids that one could reasonably interpret as a threat to them. *Cf. Simon v. Cook*, 261 F. App'x 873, 881 (6th Cir. 2008). On top of all these objective markers, Booth insisted on having a gun when he left his home, suggesting that he might engage in "irrational and dangerous behavior in the near future." *Id.*

In response, Mrs. Booth misapprehends the nature of the stop. She claims that the officers sought to arrest Booth for two minor misdemeanors from earlier in the day: littering (when he threw money out his truck window) and failing to comply with an officer's order

(when he failed to stop for Officer Aspacher). And Mrs. Booth alleges that the officers lacked a sufficient basis to believe that he had committed these "two crimes" to justify a stop based on them. Appellant's Br. 29. These arguments are beside the point. The officers did not pull Duh's truck over because Booth had committed a crime. They stopped the truck "to get [Booth] to the hospital for mental health treatment." *Id.* at 37. Besides, even if the officers had sought to detain Booth on these law-enforcement grounds, their subjective "motives" are irrelevant to the objective probable-cause analysis. *Ziegler*, 512 F.3d at 783 (citation omitted). And we have found that the officers had probable cause to detain him for a mental-health evaluation.

Mrs. Booth counters that the officers' "aggressive" approach rendered the stop unreasonable because they did not suspect him of a dangerous crime and worried only about his mental health. Reply Br. 10. She cites no precedent suggesting that an otherwise reasonable stop can become unreasonable if the police execute it in an aggressive way that relies on many officers who shout commands and use bright lights. *Cf. Brooks*, 987 F.3d at 600–01. In any event, the officers had a reasonable basis to take these precautions. They had an objective basis to believe that a mentally unstable Booth posed a danger to the officers, to bystanders, and to himself.

2. *Use of Force.* Mrs. Booth lastly argues that Officer Doughman engaged in an "unreasonable . . . seizure" by using excessive force to detain her husband. U.S. Const. amend. IV. She does not challenge the ultimate shooting. Rather, she challenges Doughman's decisions to release his police dog and attempt a takedown maneuver. But both actions were objectively reasonable.

When police have probable cause to seize individuals for a mental-health evaluation, the police also have the right to use the force required to take the individuals to the hospital—even if they do not want to go. *See Monday*, 118 F.3d at 1104. But officers do not have the right to use gratuitous force that serves no legitimate goal. *See id.* To decide whether force was warranted or unjustified, we consider the totality of the circumstances from a reasonable officer's objective perspective. *See Helms*, 2025 WL 1693827, at *4; *see also Barnes v. Felix*, 605 U.S. 73, 80 (2025).

Despite the common totality-of-the-circumstances test, our general focus changes when we switch from a criminal seizure to a mental-health seizure. *See Est. of Hill v. Miracle*, 853 F.3d 306, 313–14 (6th Cir. 2017). In the criminal context, the Supreme Court has identified several common factors to evaluate the propriety of a use of force, including, for example, the "severity" of the suspected crime. *Graham v. Connor*, 490 U.S. 386, 396 (1989). But this factor does not "fit" mental-health seizures because the individuals have not committed crimes. *Hill*, 853 F.3d at 314; *see Helms*, 2025 WL 1693827, at *4. For these seizures, we instead ask whether individuals suffered from a "medical" condition that might lead them to pose a danger and whether the force used was "reasonably necessary" to eliminate this danger. *Hill*, 853 F.3d at 314; *see Puskas v. Delaware County*, 56 F.4th 1088, 1097 (6th Cir. 2023).

Measuring Doughman's conduct under this general rubric, we conclude that he reasonably released the police dog to restrain Booth and reasonably tried to restrain Booth himself when the dog failed. First consider "what had transpired" before this force. *Barnes*, 605 U.S. at 81. Doughman (who had visited Booth's home on February 1) knew that Booth was suffering from a severe mental illness. He knew that Booth had engaged in an hours-long standoff with the police. And he knew that Booth had access to guns.

Now consider what Doughman witnessed when he opted to use force. As he brought his dog up, he observed "movement" in the truck while Duh and Booth struggled over the gun. Doughman Dep., R.63, PageID 1085. He heard that "someone may have been stabbed" and that Booth "had a gun" when Duh exited. *Id.*, PageID 1086–87. He then saw Booth "walking towards several open businesses" and a busy "intersection." *Id.*, PageID 1087. And Booth failed to comply with his orders to "come back," "get down," and the like. *Id.*, PageID 1086.

What would a reasonable officer have done in this "tense, uncertain, and rapidly evolving" situation? *Graham*, 490 U.S. at 397. Such an officer would have concluded that Booth "posed an immediate threat of serious harm to himself or others" and that the officer had to use "*some* degree of force" to detain him. *Hill*, 853 F.3d at 314 (emphasis added). After all, Booth may well have just assaulted Duh, likely had a gun, and was walking toward other "neighborhood residents." *Reich v. City of Elizabethtown*, 945 F.3d 968, 981 (6th Cir. 2019).

Next, a reasonable officer would have believed that Doughman calibrated the force (the use of a police dog and an attempted takedown) at a reasonable level "under the circumstances" he faced. *Hill*, 853 F.3d at 314. As for the police dog, it qualifies as "a comparatively measured application of force" that does not create a significant risk of any serious injury. *Puskas*, 56 F.4th at 1094 (quoting *Jarvela v. Washtenaw County*, 40 F.4th 761, 764 (6th Cir. 2022)). Police may use this type of "intermediate" force to detain those who have a weapon and appear dangerous because of their impairments. *Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 774–75 (6th Cir. 2004). As for the takedown, we have long held that "an officer may grab or tackle" a person that they reasonably fear represents a danger to themselves or others. *Zucker*, 643 F. App'x at 568. And given that Doughman reasonably chose to use a police dog to apprehend Booth, "it follows that [his] decision" to tackle Booth "was reasonable as well." *Gaddis*, 364 F.3d at 776.

Mrs. Booth's contrary arguments do not convince us otherwise. She first relies on cases that have evaluated the propriety of *lethal* shootings. *See Palma v. Johns*, 27 F.4th 419, 432–41 (6th Cir. 2022), *abrogated by Barnes*, 605 U.S. at 83; *Graves v. Malone*, 810 F. App'x 414, 421–23 (6th Cir. 2020); *Jacobs v. Alam*, 915 F.3d 1028, 1041–42 (6th Cir. 2019); *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423–25 (6th Cir. 2017). But again, Mrs. Booth does not challenge the fatal shooting of her husband. And unlike the use of firearms, the use of a "properly trained police dog . . . does not constitute deadly force." *Robinette v. Barnes*, 854 F.2d 909, 913 (6th Cir. 1988). So our assessment of the lethal force in these other cases is irrelevant to Doughman's nonlethal force.

Mrs. Booth further claims that Doughman had a duty to try to deescalate the encounter before using nonlethal force. But she misconstrues our caselaw. True, we have suggested that officers must use their expert judgment to consider whether "to de-escalate a situation" involving those suffering from mental disabilities before deploying force. *Palma*, 27 F.4th at 438. "But no caselaw supports" the claim that officers must *always* try "alternative de-escalation techniques" before using any force on mentally ill suspects. *Roell*, 870 F.3d at 482. If anything, we have suggested that a suspect's decision to possess a weapon "obviates" the need for de-escalation

techniques. *Reich*, 945 F.3d at 979.  Booth was armed and dangerous, so Doughman reasonably chose to use immediate force.

Mrs. Booth also invokes the factors that the Supreme Court has told us to examine when evaluating the force used during a *criminal* seizure.  *See Graham*, 490 U.S. at 396.  She, for example, highlights that the officers did not suspect her husband of committing a serious crime. Setting aside that Doughman could have reasonably believed that Booth had just assaulted Duh, our cases make clear that we use "a more tailored set of factors" when addressing mental-health seizures.  *Hill*, 853 F.3d at 314.  In that context, it makes no sense to consider a nonexistent crime because the officers seized the suspect for a different reason.  *Id.* at 313.

As for the relevant factors, Mrs. Booth suggests that her husband was not an immediate threat while he was "walking away" from the truck "with his hands up."  Appellant's Br. 38.  But her narrative "put[s] on chronological blinders" to everything that preceded that moment. *Barnes*, 605 U.S. at 82.  Doughman knew that Booth had just struggled with Duh and had a gun while suffering from a mental-health crisis.  And he knew that Doughman was walking toward other people.  It is helpful to consider "the alternative[s]" to Doughman's actions.  *Ashford v. Raby*, 951 F.3d 798, 802 (6th Cir. 2020).  Should he have just let a potentially dangerous Booth continue walking?  Should he have kept shouting at Booth even though Booth had not responded to earlier orders?  The Fourth Amendment does not require officers to tolerate such ongoing threats.

Mrs. Booth adds that her husband did not actively resist arrest within the meaning of our caselaw.  Yet, no matter how we characterize his conduct, officers may reasonably deploy a police dog when they believe that it is not safe to approach a subject.  *Cf. Burgess v. Bowers*, 773 F. App'x 238, 246–47 (6th Cir. 2019).  And here, it was reasonable for Doughman to first try to incapacitate Booth from a distance given his noncompliance with police commands, potential assault on Duh, possession of a gun, and mental instability.

Finally, Mrs. Booth claims that Doughman's use of force violated the City of Monroe's policies.  Even if she were right, that fact would not change things.  We do not tie our Fourth Amendment rules to each police department's use-of-force policies because that connection

would encourage cities "to adopt the least restrictive policies possible." *Smith v. Freland*, 954 F.2d 343, 348 (6th Cir. 1992). The Fourth Amendment sets a minimum level of protection, and police departments may freely hold their officers "to a higher standard" of conduct. *Johnson v. Sootsman*, 79 F.4th 608, 622 (6th Cir. 2023) (quoting *Smith*, 954 F.2d at 347). Under the Constitution, officers need not use "the best technique available"; they need only use a reasonable one. *Ashford*, 951 F.3d at 801. And Doughman acted reasonably here.

\* \* \*

At day's end, Mrs. Booth raises legitimate questions about how her sincere efforts to get her husband mental-health treatment could turn into a fatal shooting. We sympathize with her desire for accountability. And in hindsight, perhaps one could think of alternative ways the officers could have handled this dangerous situation. But the law does not permit us to engage in that type of judicial second-guessing tied to how the events turned out. *See Graham*, 490 U.S. at 396. The officers' conduct did not violate the law because of the obvious danger that Booth posed. And it is for the City of Monroe's politically accountable officials (not federal judges) to reassess their police practices in light of what happened in this case.

We affirm.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring. Does the Americans with Disabilities Act (ADA) require police officers to depart from their usual methods for making arrests when they confront individuals with disabilities? The majority opinion does not need to resolve this question because it can reject Brandi Booth's ADA claim on narrower grounds. Still, I am skeptical that one can read the ADA to compel a police department to change its policies for taking individuals into custody. I reach that conclusion for both a general reason and a specific one. As a general matter, courts have already stretched the ADA's text in debatable ways by requiring governments to offer accommodations in *any* context. So, as a specific matter, courts should think twice before they read the ADA to compel those accommodations in this "tense, uncertain, and rapidly evolving" *arrest* context. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

I. General Reason: Does Title II of the ADA Contain an Accommodation Requirement?

The ADA has three main parts. Title I prohibits employers from discriminating against employees with disabilities in personnel decisions; Title II prohibits governments from discriminating against constituents with disabilities in public services; and Title III prohibits private entities from discriminating against customers with disabilities in public accommodations. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675–76 (2001). This case concerns the title that applies to "State or local government[s]" and their agencies: Title II. 42 U.S.C. § 12131(1)(A)–(B). For the most part, that title regulates governments in a single command: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132.

What does this text require governments to do (or refrain from doing)? Our precedent has read it *both* to prohibit "intentional discrimination" *and* to require "reasonable accommodation[s]." *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017); *Ability Ctr. of*

*Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004).  The former prohibition sits firmly within the statutory text.  But the latter requirement rests on much shakier ground.

Start with our flat ban on intentional discrimination.  That ban follows naturally from the text because § 12132 bars a "public entity" from "subject[ing]" a disabled individual to "discrimination" "by reason of" the individual's "disability[.]"  42 U.S.C. § 12132.  And I would think the word "discrimination" should have its usual meaning to require a "distinction" "in favor of or against a person" based on "the group, class, or category to which the person" belongs.  *Random House Dictionary of the English Language* 564 (2d ed. 1987); *see Webster's Third New Int'l Dictionary of the English Language* 648 (1981); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 (1999) (Thomas, J., dissenting).  This type of discrimination thus targets individuals with disabilities for *distinct* mistreatment "by reason of" their disabilities.  42 U.S.C. § 12132.  In other words, individuals who assert intentional-discrimination claims must show that a public entity took a harmful action against them "because of" their disabilities.  *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 325 (6th Cir. 2023) (quoting *Anderson v. City of Blue Ash*, 798 F.3d 338, 358 (6th Cir. 2015)).

Consider two examples that might fall within the text.  Suppose that a malevolent building manager prohibits those with disabilities from bringing their service dogs into public buildings while allowing others to bring their pets into those buildings.  Or, even more relevant, suppose a malevolent police officer regularly arrests disabled individuals for certain crimes while permitting those without disabilities to remain at large for the same conduct.  The unequal treatment in these examples would show the "animus" required to fall within the ordinary meaning of the phrase "discrimination" "by reason of" a disability.  *See id.* at 326.  But Mrs. Booth does not argue that the officers here engaged in this discrimination when they stopped and tried to detain her husband.  Rather, she criticizes the officers for handling this "high risk stop" *in the same way* that they would handle "any other high risk stop" of any other person.  Appellant's Br. 13.

Turn to our requirement that governments must adopt reasonable accommodations to their general policies for those with disabilities.  Like Judge Readler, I find it more difficult to see how § 12132's text imposes this mandate.  *See Reinhart v. City of Birmingham*, 2025 WL

2426820, at *6 (6th Cir. Aug. 22, 2025) (Readler, J., concurring).  Break § 12132's language into its two parts.  To start, one cannot read an accommodation requirement into the text barring governments from "subject[ing]" individuals with disabilities "to discrimination[.]"  42 U.S.C. § 12132.  Suppose a government adopted a flat ban on animals in buildings for health or sanitary reasons.  Nobody would say that the government engaged in "discrimination" against individuals who need service dogs "by reason of [their] disability" if the government applied this neutral ban equally to all who brought dogs into buildings.  It has instead treated *everyone the same*.  This rule might have a disparate impact on those with disabilities because it might "disproportionately" undercut their ability to use public buildings.  *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241 (6th Cir. 2019).  And, as a moral matter, one might think the government should adopt reasonable accommodations for them.  But, as a legal matter, the phrase "discrimination" "by reason of" a "disability" does not reach neutral rules applied equally to all.  *See id.* at 241–42.

So if a reasonable-accommodation requirement can be found in § 12132, it must arise from the first part of the text that does not use the word "discrimination."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003); *see Ability Ctr.*, 385 F.3d at 909–10; *Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir. 1996).  This part tells a government that it may not "exclude[]" qualifying individuals "from participation in"—or "den[y]" them "the benefits of"— "services, programs, or activities" "by reason of" their "disability."  42 U.S.C. § 12132.  Perhaps one could read "by reason of" in a lax way to demand *only* the tort concept of but-for causation.  *See A. J. T. ex rel. A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 356–57 (2025) (Sotomayor, J., concurring).  And perhaps one could view the statute as adopting a de facto—rather than a de jure—understanding of the verbs "excluded" and "denied."  Under that view, these verbs might cover more than policies that *intentionally* deny benefits to the disabled (for example, a policy disqualifying the disabled from a program).  The verbs also might cover policies that "*effectively*" deny benefits to the disabled (for example, a policy of using "braille-free ballots" that prevent "a blind person from voting").  *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (emphasis added); *A. J. T.*, 605 U.S. at 357 (Sotomayor, J., concurring).  In short, disabled individuals might be said to "be denied . . . benefits" "by reason of" their disability if that disability made it *practically* impossible for them to obtain the benefits and if

they would have obtained them in a counterfactual world in which they did not have the disability. 42 U.S.C. § 12132.

Other statutory provisions might support this reading. Of most note, only a "*qualified* individual with a disability" may invoke Title II's protections. *Id.* (emphasis added). And this phrase's definition shows that a government must make only reasonable accommodations to a policy that effectively denies benefits to disabled individuals because of their disabilities. The ADA defines "qualified individual with a disability" to mean a disabled individual "who, with or without *reasonable* modifications to rules, policies, or practices, . . . meets the *essential eligibility requirements* for the receipt of services or the participation in programs or activities provided by" the government. *Id.* § 12131(2) (emphases added); *see also id.* §§ 12101(a)(5), 12201(h).

All this said, this reading of § 12132's language seems quite forced. Among other reasons, laws that use language like "by reason of" generally do not require but-for causation alone. To be sure, they make that type of causation a *necessary* condition. Who, for example, would say that an individual was denied a benefit "by reason of" a disability if the government would have denied the benefit even if the individual did not have that disability? *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–77 (2009). But the law does not generally make but-for causation a *sufficient* condition too. For instance, the law also generally requires proximate causation. *See Olmstead*, 527 U.S. at 626 (Thomas, J., dissenting). And when a statute says that some factor must be the "reason" why a person took some action, the statute typically makes the decisionmaker's "*motive*" for taking the action "critical" to liability. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (emphasis added); *see Reinhart*, 2025 WL 2426820, at *6 (Readler, J., concurring).

Unsurprisingly, then, courts have held that similarly worded statutes require intentional discrimination in the denial of benefits or exclusion from programs. Title VI, for example, provides: "No person . . . shall, on the ground of race, color, or national origin, be *excluded* from participation in, be *denied* the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphases added). And the Supreme Court has long read this text to require proof of intentional racial discrimination rather

than disparate racial effects. *See Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001); *Reinhart*, 2025 WL 2426820, at \*6 (Readler, J., concurring). Likewise, the Rehabilitation Act says that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be *excluded* from the participation in, be *denied* the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a) (emphases added). And we have read this text to exclude actions "taken for nondiscriminatory reasons" even when the actions disparately affect the disabled. *Doe*, 926 F.3d at 241–42. Why should Title II of the ADA be different? Courts should justify their decision to interpret the same language in different ways across similar laws. And I see no such justification.

Worse still, the ADA elsewhere shows that Congress knows how to require regulated parties to make reasonable disability accommodations to general policies. The text of both Title I (governing employment) and Title III (governing public accommodations) contains these sorts of mandates. *See Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 750 & n.8 (7th Cir. 2006) (en banc). These laws "expressly define discrimination" in a unique way to cover a decision to treat the disabled *like everyone else* by failing to make "reasonable accommodations" for them. *Reinhart*, 2025 WL 2426820, at \*7 (Readler, J., concurring) (citing 42 U.S.C. §§ 12112(b)(5)(A), 12182(b)(2)(A)(ii)). Other laws contain similar unique definitions. *See Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020). Courts, of course, must follow an "artificial meaning" of the words "discriminate" and "discrimination" when Congress expressly includes that meaning in the law *itself*. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 225 (2012). But the words should take their ordinary meaning when Congress opts not to include such a statutory definition. *See id.* at 69. And Congress did not put one in Title II.

This omission also undercuts the claim that the ADA's generic statement of purposes shows that Title II requires governments to make reasonable accommodations. *See Sosa v. Mass. Dep't of Corrs.*, 80 F.4th 15, 31 (1st Cir. 2023); *Ability Ctr.*, 385 F.3d at 909. When listing the ADA's purposes, Congress found that disabled Americans continue to "encounter various forms of discrimination, including" not just "outright intentional exclusion" but also the

"failure to make modifications to existing facilities and practices[.]"  42 U.S.C. § 12101(a)(5). Does this statement permit us to define "discrimination" in an odd way to mean its opposite: equal treatment?  No, it explains why Congress defined the word in that way in Titles I and III. But Congress did not grant this added protection in Title II.  So unlike the word "disability" (which Congress defined in the same way for the entire ADA), *see id.* § 12102, the word "discrimination" contains no overarching statutory definition.  Congress instead added a broad definition of the word in Titles I and III and kept to its narrower ordinary meaning in Title II. We must respect this choice.  As the Supreme Court explained in another ADA case, "no statute yet known pursues its stated purpose at all costs."  *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)).  And the "textual limitations upon a law's scope" form part of the congressional compromise that led to its passage just as much as its general purposes.  *Id.* (citation omitted).  Yet courts would upend this compromise if they used a law's general purposes to blow past its express limits.  *Cf. Commonwealth v. Biden*, 57 F.4th 545, 551–52 (6th Cir. 2023).

Besides, most courts that have required governments to make reasonable accommodations have not rested on a careful textual parsing of § 12132.  They have instead rested on a regulation issued by the Attorney General.  *See Sosa*, 80 F.4th at 31; *Wis. Cmty. Servs.*, 465 F.3d at 750–51.  Yet this regulation cannot support these decisions.  It provides that a "public entity" must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  The regulation thus tells governments to make accommodations *only* when "necessary to avoid discrimination on the basis of disability[.]"  *Id.*  So it likely does not support the claim that Title II applies to *neutral* policies that do *not* discriminate.  And even if the regulation could be read to cover neutral policies, the courts that have relied on it have opined that they should defer to the Attorney General's views of the law.  *See Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506–08 (4th Cir. 2016); *Wis. Cmty. Servs.*, 465 F.3d at 751 & n.10.  But we may not give that deference now that the Supreme Court has instructed us that courts (not agencies) must resolve questions about the scope of laws like

the ADA.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).  That deference is particularly problematic here because background norms should instead compel us to resolve any ambiguity in Title II in favor of state and local governments.  *See Reinhart*, 2025 WL 2426820, at *7 (Readler, J., concurring).

## II.  Specific Reason: Is an Arrest a "Service, Program, or Activity"?

Be that as it may, our precedent has long permitted reasonable-accommodation claims under Title II.  *See Ability Ctr.*, 385 F.3d at 907.  Still, I would pause before *expanding* these cases to reach a police department's policies for taking individuals into custody during an arrest—something we have yet to do.  *See Roell*, 870 F.3d at 489.  As I have explained, any reasonable-accommodation requirement must flow out of the part of Title II that tells a state or local government not to "exclude[]" qualified individuals "from participation in"—or "den[y]" them "the benefits of"—public "services, programs, or activities" "by reason of" their "disability."  42 U.S.C. § 12132; *cf. City and County of San Francisco v. Sheehan*, 575 U.S. 600, 608–10 (2015).  An officer's conduct in physically taking a person into custody does not fall within this language.

For starters, it is not obvious that such conduct qualifies as a "service[], program[], or activit[y]" under Title II.  42 U.S.C. § 12132.  Admittedly, the use of the word "activity" has led us to opine that this phrase "encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998).  If true, however, one would say that the government engages in a covered "activity" when it hires or fires an employee.  Yet other courts have refused to read "services, programs, or activities" to reach public employment. *See Brumfield v. City of Chicago*, 735 F.3d 619, 625–30 (7th Cir. 2013); *Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla.*, 693 F.3d 1303, 1306–14 (10th Cir. 2012) (Gorsuch, J.); *but cf. Bledsoe v. Palm Beach Soil & Water Conservation Dist.*, 133 F.3d 816, 825 (11th Cir. 1998). Because a word is known "by the company it keeps," these courts have instead reasoned that this phrase reaches only the "outputs the public entity provides to the public it serves"—not "everything the entity does." *Elwell*, 693 F.3d at 1307.  For our part, we have left this employment question open. *See Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011).  And we have held that the phrase "services, programs, or activities" excludes the design of public

buildings. *See Babcock v. Michigan*, 812 F.3d 531, 535–39 (6th Cir. 2016). So perhaps some government actions *do* fall outside this phrase.

Under this narrower view, the phrase "services, programs, or activities" may well exclude an officer's act of taking someone into custody. While the police provide many "services" to individuals that they protect, I doubt that anyone would describe a police officer's arrest of someone as the provision of "services" to that person. *Cf. Elwell*, 693 F.3d at 1306–07. And while an arrest would fall within the ordinarily broad meaning of the word activity, *see Random House Dictionary*, *supra*, at 20, it would likely fall outside the narrower meaning of this word when read against the other two items in the set (services and programs). I suspect that few would describe arrests as one of the many "outputs" (like education or medical care) that the government "provides some public constituency." *Elwell*, 693 F.3d at 1306.

In all events, one need not definitively decide that an arrest falls outside the phrase "services, programs, or activities" to conclude that it falls outside Title II. We must not parse these statutory words in isolation. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). Rather, we must place them within their broader statutory context. *See id.* And that context shows the poor fit between Title II's text and the conclusion that it regulates arrests. An accommodation-less arrest would violate Title II only if the failure to grant the accommodation caused a qualified individual to be "excluded from participation" in the arrest or "denied the benefits of the" arrest. 42 U.S.C. § 12132. This phrasing strikes the ordinary ear as nonsensical. I have no idea what it would mean for someone to be "excluded from participation" in an arrest. Must the police officers fail to carry out the arrest? After all, this language would suggest that an individual must have been "shut out" of "taking part" in the arrest. *See Webster's Third*, *supra*, at 793 (defining "exclude"); *id.* at 1646 (defining "participation"); *Random House Dictionary*, *supra*, at 675, 1414 (same). Next, I am equally puzzled by what it would mean for someone to be "denied the benefits" of the arrest. What "entitlement" or "[p]ecuniary advantage, profit, [or] gain" does an arrestee receive from the arrest? *American Heritage Dictionary* 173 (3d ed. 1992); *Oxford English Dictionary* 111 (2d ed. 1989). Most people would view it as a loss—not a gain.

The definition of "qualified individual with a disability" reinforces this basic problem. 42 U.S.C. § 12131(2). Again, that definition requires an individual with a disability to "meet[]

the *essential eligibility requirements* for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* (emphasis added). It makes no more sense to ask whether an individual meets the "essential eligibility requirements" for an arrest. Would this test require courts to ask whether the police have probable cause for the detention? *See United States v. Watson*, 423 U.S. 411, 414–24 (1976). All told, I see no plausible way in which an arrest could fit within Title II once we read its text as a coherent whole. *See Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000); *Rosen v. Montgomery County*, 121 F.3d 154, 157 (4th Cir. 1997).

But one should not overread this analysis. Other services, programs, or activities that governments offer to arrestees might fall within Title II. As the Supreme Court has said in the similar corrections context, prison officials may well provide inmates with many things that Title II covers, including "recreational 'activities,' medical 'services,' and educational and vocational 'programs[.]'" *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998). Likewise, arrestees might receive similar items. One might say, for example, that they receive on-the-spot medical "services" when (as in this case) the police must use physical force to detain them. And perhaps one could say that they receive transportation "services" when the police transfer them from the scene to the jail. Thus, if officers arrest individuals in a way that effectively denies them some *other* benefit because of their disability, perhaps the officers may have to provide a reasonable accommodation (again, assuming that Title II requires those accommodations at all).

In this way, arrests may resemble public facilities. Those facilities do not themselves qualify as covered services, programs, or activities. *See Babcock*, 812 F.3d at 535–39. Rather, plaintiffs can state a claim under Title II based on a building's design only if they show that the design caused them to miss out on some *other* service, program, or activity. *See id.* at 536. The same logic might extend to arrests. But we need not decide this question because Mrs. Booth has not invoked any other services, programs, or activities in this case. *Cf. id.* at 538.

At day's end, this case does not require us to decide whether Title II covers arrests because we can resolve it on narrower grounds. But our decision to take that narrow path does not endorse all the assumptions we made along the way. In an appropriate case, parties remain free to argue that arrests alone fall outside Title II. On this understanding, I concur in the majority opinion.